OPINION of the Court, by
Judge Loban.
— These are suits upon adversary conflicting claims to land, in which Halbert and others and Patty Harris and Co. were complainants, holding under distinct titles, but are depending on the other ; and such decrees having been rendered, both parties have appealed therefrom to this court.
Previous to an examination of the claims on their merits, a preliminary question which was made in argument, must first be disposed of, whether the general court did properly in those suits entertain jurisdiction Í Some of both the complainants and defendants are residents, and others nonresidents, joined in the same suit.-
*385 The general court derives its jurisdiction from the apt of 1799, (2 Litt. 309) which declares that “in all controversies between nonresidents and between nonresidents and the cifzens of this state, where the matter in dispute shall he above the value of % 20, and in all cases between citizens of this state respecting the titles or bounds of lands, if both parties consent and agree thereto ; which consent and agreement, if made before the commencement of the suit, shall be in writing-, signed by the parties, attested by two witnesses, and filed with the clerk at the issuing of the writ or subpoena or at the return of the declaration in ejectment; and all such cases respecting land as aforesaid, may also be removed from any of the district courts to the general court, at any time pending the same, upon the parties or their agents petitioning the court to remove the lime.”
By this act the general court is, with the consent of the parties, vested with jurisdiction in all cttges where the titles to land is the subject of controversy ; and fay the act regulating proceedings in courts of chancery, passed in 1796, (1 Litt. 523) “after answer filed and no plea in abatement to the jurisdiction of the court, no exception for want of jurisdiction shall ever afterwards be made, nor shall the court ever thereafter delay or refuse justice or reverse the proceedings for want of jurisdiction, except in cases of controversy respecting land lying without the jurisdiction of such courts, and also of infants and femes covert.”
The jurisdiction of the general court is co extensive with the state in those cases of which it has jurisdiction. In the present suits no exception for want of jurisdiction was made in the court below ; the defendants answered and the causes progressed to a final hearing on the merits.
The order in pleading is first to the jurisdiction of the court; and if no exception is taken it is an admission of jurisdiction. This rule is in unison with the act just quoted; and although consent cannot give jurisdiction where the law does not give it, for that would make the act of the parties to control the. law, yet where the law gives jurisdiction of the subject matter in controversy, provided the parties consent, and they demonstrate their conset by preparing the cause and go- *386 jpg tQ tna^ the court could never refuse to determina their cause upon the ground of supposed unwillingness by either of the parties.-
It is true the law gives the general court jurisdiction Between citizens in case of-consent only, and requires' that their consent, if given before the commencement of the suit, shall be in writing, signed, attested and filed' with' the clerk.; but it is believed when the consent of the parties is manifested by the record or proceedings in court, that such writing is unnecessary. A writing 5s only required to prove the agreement relied on before the commencement of the suit, in order to guard against doubt and dispute ; but when consent is given in court, or apparent from the proceedings in court, the writing dehors the record, executed out of court, cannot be required to satisfy the court of such consent.
The law then having given jurisdiction to the general court in certain cases between citizens, if they consent to it, and having declared that after answer filed-no exception for want of jurisdiction should thereafter be taken, except in certain cases, not embracing the present suits, it follows therefore that the objection to jurisdiction comes now too late.
The decisions of the supreme coiirt of the United Stales which have been-relied on as' shewing the want’ of jurisdiction in the present suits, do not apply. The courts of the United S'ates derive jurisdiction from the constitution and laws of the United States, which do,not make their jurisdiction to depend on the consent of the parties, and coiisent ot the parties cantiot give jurisdiction where the law has not given it. But the general court derives jurisdiction from the law, between citizens, if the parties consent, inf controversies relating to the titles of land. So that in one case the law has given jurisdiction, with the consent of the parties, and has declared that after answer filed no exceptions for want of jurisdictioh shall thereafter be taken, and' in the other a similar power is not given.
We shall now proceed t<5 an investigation of the re-spestive claims, and first of the complainants; The first in order is founded on an entry in the name of Isaac Halbert and others, which was made on the first of March 1784, for 12,311 acres, beginning ai the junction of -the fork of Hinkston’s fork and the first fork that *387 empties into Hinkston on the north side below the mouth of Flatlick creek, commonly known by the name of Clement’s fork of Hinkston, and running from thence certain courses and distances to include the quantity.
And on the same day Patty Harris and Co. made atj. entry of 17,372 acres, beginning at the southwest corner of Isaac Halbert and others’ entry of 12,311 aeye?, on Hinkston’s fork, and running with their line Certain ¡Courses and distances.
These entries have been surveyed pursuant to their respective calls from the place of beginning assumed ; so that the only question in relation to their validity ⅛ as to the place of beginning. Hmkstori’s fork and Flat-Jick creek were both generally and well-known by those names when the entries were made ; and the first creek or fork emptying Into Hinkston below the mouth of Flatlick creek on the north side, at its confluence with Hinkston, is made the .point of beginning of Halbert and others’ survey. This cre^k is proved to have been sometimes called Clement’s fork, and sometimes the Brushy fork of Hinkston’s fork •. but n is not material by ■which of those names it was most generally known, or yyhether it was sufficiently known by either or both names ; because the stream is well described by reference to Hinkston’s fork and Flatlick creek, as the -first that empties into Hinkston on the north side below the mouth ■of Flatlick creek. And although the call for the junction of the fork of Hinkston’s fork with another fork, Implies the confluence of these streams, in exclusion of main Hinkston, yet the subsequent explanatory call in the entry shews that the point of beginning is the junction formed by a particular stream which empties into .Hinkston with that fork of Hinkston’s fork of Licking into which it empties, and the entry taken entire and ungarbled applied to the water courses presented, leaves no rational ground to doubt that this is the place of beginning.
, We come now to consider the respective claims of ■ihe defendants ; and in doing this, we will observe the order pursued by the general court, commencing first with the entry of Doctor Anderson for*2QOO acres, which was made bn the Í 4th of January, 1783, “ lying about an eastwardly course from Riddle’s Station, beginning two miles and a half northeast from the place *388 whereJthe house stood that John Haggirilived iff, ⅛ the sarmner 1776, and running a line from said beginfiing north 25 east 640 poles, then extending from each end of said line S. 65 E. until a line paralliTto the same shall include t’^e quantity of vacant land.” ' ;'
On the same day Tilomas Anderson entered 126!M*2 «apses adjoining Doctor Anderson’s 2000 acre entry, beginning at the south corner thereof and running with the line of said entry N. 25 E. 640 poles, and thence ■S» 65 E. until a line parallel to the same shall include the quantity. And on the same day the entries of William Griffith for 1612 1-2 and Robert ¡Caldwell for 1931 acres, were made adjoining, containing similar calls of ■ location!
The place where John Haggin lived in 1776, wastio-torious when these entries were made in 1783, and the courses and distances for the Same are sufficiently precise and descriptive of the land located ; but a question occurs in the examination of diese entries which is perhaps novel and important, not only in the present suits, but maybe also so as a- precedent to the rights of others — how far erasures or alterations in entries, varying their positions and making them to occupy different ground, shall affect their validity ?
It appears from an inspection of the entry book that ■ Doctor Anderson’s entry of 2000 acres, as originally made, called to begin “ one mile and a half ” N. E, from the house in which John Haggin lived in the summer 1776, instead of “ two miles and a half,” as it now stands in the entry book; and that the courses in this chain of entries have also been altered from what they originally were. But by whom, or at what time the alterations were made, docs not Clearly appear. It is inferable, however, front evidence in the cause, that thecourses were altered before the alteration teas made in the distance, from ene and a half to two and á half miles : for it is improof that a copy of Doctor Anderson’s entry had been obtained from the surveyor’s office, in the hand writing of a deputy or clerk ⅛ the office,and that this copy had been altered in a different han'd writing, from ojie to two, thereby making i t to read ‘‘ two miles and a half,” instead of “ one mile and a half,” but which corresponded in courses with the entry as it stands altered in the'entry book. This'entry, *389 as thus altered, was seen in the possession of the legal representative of him through whose agency these entries were made, but by whom the alteration in the record was made is not proved.
From this state of facts it is not difficult to perceive that the principle does not apply “ that he who alters his title paper in a material part, thereby corrupts it and ■ destroys its validity as evidence of right,” because in these suits it does not appear that the alteration was made by or with the consent or privity of the proprietor. Amendments or apparent alterations in entries on record, without proof cannot be held as fraudulent against the claimant of land, and his title thereby corrupted. It ought rather to be presumed that the alteration was made with the joint concurrence of the surveyor and claimant: for it was the right of the latter to amend his entry, and the duty of the former to direct its place in the entry book. He, as the officer of the government to whose custody the record containing this evidence was confided, in legal estimation must be presumed cognusant of amendments in entries made in his office, which can only be repelled by proof to the contrary.
This reasoning seems not only correct in principle, but peculiarly applicable to the entries of record in this country, |n which it is believed many instances may be found of erasures and alterations, occasioned perhaps through the great haste and manner in which entries tvere often written, and some times exclusively attributable to the officer, without blame against the claimant. To presume, however, apparent alterations in the entry unfavorable to the private right, and apply the effect of-corrupted writings to his title, would, as a precedent, endanger the most of such claims ; because at this distant period (and still becoming more so) proof against this presumption is not to be expected.
Assuming then as a correct principle, that entries have been made as they appear in the entry book, with the knowledge of both the surveyor and proprietor, where there is not clear evidence rebutting such presumption and satisfactorily shewing forgery in the record, we are necessarily led to the inquiry whether there exists such evidence in the present suits ? To this inquiry we have already responded.
*390 It will result from these premises that whether an entry'.is'amended by a separate and distinct entry, refer-ing to the former, or by erasingsome words and inserting others, or interlineation in the original entry, where, they are alike intelligible, equally answering the object of an entry in communicating information to others, as they appear in the entry book, they should receive the same construction from the respective periods of alter-: ation j and where it does not appear from ree rd at what time the alteration was made, it should be presumed to nave happened when the entry was made, and take precedency accordingly, unless proof against such presumption is adduced.
It is proved in these causes that this block of entries was completed before either the alteration in distance or courses was made j but how soon thereafter the courses may have been altered, is uncertain ; it may have been on the same day ; and it is conceived such should be the presumption, where there is no evidence to the contrary. It appearing, however, from evidence that a copy which had been given out of the office corresponded in its courses with the entry as it now appears on record, but had been altered in a different hand writing as to distance, the inference ispear that the chain of entries should, as to their courses, be considered as made and the position of each fixed and certainly located before the, call as to distance, had been altered. ,
If then the fact is inferable from this circumstance, and the erasure apparent on the face of the entry as recorded, that the entry of Doctor Anderson, after being located, and the other entries depending thereon fixed to precise spots, agreeably to the courses and calls in the entries, was altered from its place of beginning at “ one mile and a half,” to “ two miles and a half,” from where Ilaggin’s house stood, this alteration would not produce a corresponding alteration in changing the positions of. the other» entries to a greater distance from Haggin’s house, which was called for, than the calls at first necessarily place them.
It was the privilege of Doctor Anderson to amend his entry so as to begin two and a half, instead of one and a half miles from a given place ; but he did not possess the right, unless so empowered, to remove the *391 locations of others, and draw after his entry the,, whgle of'their’s to ground they never intended and never called for.
So far, therefore, as the entries of Thomas, Anderson, Griffith and Caldwell have been surveyed contrary to their respective locations, as they were originally made, assuming as their foundation the entry of 2000 acres béginning one mile and a half from where Hág-giu’s house stood in 1776; and running the courses mentioned in the entry; they have been erroneously surveyed and must yield to the claim of, the complainants.
As to Barbour’s entry, it need only be remarked, that by an amendment Subsequent to its date to the complainants’ entries, it is eiitirely removed from the ground comprehended by the entry as it stood before it was amended, and is therefore inferior to the complainants’;
We come next to investigate Pollock’s settlement and pre-emption, under which Owing holds. It was granted for raising corn in the country in 1776, and the location of the settlement callé to lie on the north side of the middle fork of Licking creek* adjoining the lands of John Miller, to include his improvement.)
John Miller obtained a certificate for a settlement and pre-emption,'containing similar calls of description, and to adjoin the land of Alexander Pollock, and in-*elude his improvement-
It is proved that Both Pollock and Miller had improvements, consisting of cabins, made in 1775 ; that about the last of May in that year the company of im-provers left Kentucky, soihe of whom returned in 1776, and in that year Pollock With others raised corn at a place several miles from his cabin, which had been made in the preceding year, and that this place where he raised corn was also called Pollock’s improvement.
The simple question then to be determined is, on which of these improvements would Pollock’s entry fix his claim ; or do they render it void for uncertainty as to the one intended ?
It may be premised, that the other,calls in the entry do not shew that one of these improvements Was intended in preference to the other, except the expression that the claim was granted “ on account of raising a crop of corn in the country in the year 1776.”
*392 Both improvements having been called Pollock’s, and place where he raised corn being last selected, seems entitled to farther claims as his choic e, when to this consideration is added the service Or consideration on which the claim was granted, “ on account of raising corn in 1776,” which carries with it a more striking connection with and relation to that place, or would as readily, if not more so, have induced the expectation that it was there Pollock had located his settlement, as this improvement equally or better fits the call; and where twb or more objects equally apply to the calls and description in an entry, which would fix it on entirely different ground, it cannot be sustained on account of its uncertainty.
The pre-emption appendant thereto contains in its location no call tvhich can aid the vagueness in the settlement entries, and is therefore vague and must yield to the complainants’ claim.
It need only be further observed, that this entry comés upon a state of case altogether different from that in which it was formerly presented for the decision of this court. In that case the place where the com was raised in 1776, Was not shewn, nor was there any evidence offered in relation thereto.
Decree of the general court, so far as it is variant from this opinion, reversed and set aside, and so far as it ac- * cords therewith, affirmed ; cause remanded for new proceedings tobe had consistent with this opinion. The complainants in the court below to recover of the defendants their costs.